## A97A0092. CARROLL v. THE STATE.
(481 SE2d 562)

ELDRIDGE, Judge.

A Gwinnett County jury found appellant, former DeKalb County police officer Joseph Mathis Carroll, Jr., guilty of the offenses of aggravated stalking and terroristic threats. He appeals.

The evidence demonstrates that appellant separated from his wife, Tammy Carroll, in August 1995; appellant moved out of the marital residence, a mobile home located in a mobile home park at 741 Stone Hill Drive in Stone Mountain, Gwinnett County. Several days later, appellant broke into this residence and brandished a gun while threatening his wife; immediately thereafter, Ms. Carroll filed

a petition under the Family Violence Act, OCGA § 19-13-1 et seq., and obtained a temporary protective order (TPO), dated August 30, 1995. The TPO gave Ms. Carroll temporary possession of the mobile home; the TPO specifically stated that "until further order of this Court, the Defendant shall not come upon said premises or have contact with the Plaintiff or the Plaintiff's minor child(ren)." At the time of the issuance of the TPO, a hearing was scheduled on the merits of the petition pursuant to OCGA § 19-13-3 (c). On August 30, 1995, appellant received notice of the TPO, as well as the hearing; appellant chose not to attend the hearing.

At the hearing on September 6, 1995, the court entered a "Judgment Under the Family Violence Act" (Judgment); the Judgment provided that "[s]ole, exclusive use and possession of the residence . . . shall be awarded to the plaintiff[.]" Both the TPO and the Judgment enjoined the appellant from threatening or attempting to injure or harass Tammy Carroll. In addition both the TPO and the Judgment evicted appellant from the mobile home and ordered the Gwinnett County Sheriff's Department to aid in the removal of the appellant and his belongings from the residence. Further, the Judgment, which gave Tammy Carroll sole custody of the parties' minor child, allowed appellant date-specific visitation privileges, but only after providing Ms. Carroll with 48 hours notice of his intent to exercise those privileges. Appellant received a copy of the Judgment approximately a week after its signing.

In the early morning hours of October 5, 1995, in the midst of the storm generated by hurricane Opal, the incident which gave rise to the indictment in the case sub judice occurred. Appellant, who was working the 5:00 p.m. to 1:30 a.m. shift at the DeKalb Police Department, left work at approximately 2:30 a.m. and returned to his residence; at this time, appellant was residing with his grandmother in Chamblee, DeKalb County. Appellant testified at trial that after he arrived at his grandmother's house, he opened a beer and began to pay bills. Appellant testified that "the storm was raging and it was windy — it wasn't raining, but it was very windy and obviously, you know, a bad storm. Branches had been knocked down . . ."; however, appellant discovered that he had no postage stamps. So, at approximately 4:00 a.m., apparently in the middle of a raging storm, appellant testified that "I [went] to get some stamps so I could get these bills in the mail as soon as possible."

Appellant's journey took him first to the Chamblee Post Office where a wide-spread power outage, which must have, perforce, also encompassed his grandmother's house in Chamblee, frustrated appellant's attempts to obtain postage stamps, since the electronically operated stamp machine was not working. Undaunted, appellant drove through the storm to the Embry Hills Post Office where

the power outage, again, prevented the successful acquisition of stamps. Onward to the Tucker Post Office in DeKalb County with the same disappointing results; thereafter, appellant headed toward the Stone Mountain Post Office in DeKalb County in order to "accomplish the goal to get the stamps."

Appellant testified that he realized that his route had taken him close by his wife's mobile home park in Gwinnett County, and thus, he decided to stop by the central mailbox in the mobile home park in order "to check to see if there was any bills in the mailbox"; so he made yet another postal stop. Thereafter, appellant testified that because of the violence of the storm in which he had been roaming around, "I figured I'd just ride by and make sure that every — a tree didn't fall on it, to make sure everything's okay. And I drove by the trailer."

Appellant testified that "in the driveway where I had normally parked my car," was a vehicle appellant recognized as belonging to Daniel Harvey, Tammy Carroll's new boyfriend. Appellant testified that upon seeing Harvey's vehicle, he was *not* irate or angry; instead, appellant was "very upset," "overcome with emotion," and "it confirmed all [his] suspicions"; appellant "knew that they were in bed together," and "had a good idea what was going on in that bedroom." In that regard, appellant exited his car and banged on the front door of the trailer while shouting obscenities; appellant repeatedly threatened to kill Daniel Harvey. Appellant went to the master bedroom window where he ripped the screen from the sash; still shouting threats, appellant climbed through the opened window and entered the bedroom.

Appellant had correctly assumed that Tammy Carroll and Daniel Harvey were in the master bedroom, but so were Ms. Carroll's two children; the family had gathered in the bedroom to ride out the storm together. When Tammy Carroll heard what she immediately recognized as appellant's voice, she ran into the living room to call 911. As appellant entered the bedroom through the window, he stepped on his three-year-old daughter who was still lying in the bed; Ms. Carroll shouted for her children to come with her, and they all fled to a neighbor's home where Ms. Carroll again called 911.

As appellant came through the window, Daniel Harvey reached for a gun he had hidden under the bed; he could not get it out of the holster. As soon as he was through the window, appellant grabbed for Harvey, and a struggle ensued with appellant again threatening to kill Daniel Harvey. The gun discharged and eventually fell during the struggle. Daniel Harvey was able to escape the trailer and attempted to call the police at the trailer park's clubhouse. Appellant took Harvey's gun, left the trailer, and threw the weapon into a nearby open field.

Shortly thereafter, the police arrived; appellant had returned to the outside of Tammy Carroll's trailer. Appellant told the police that he "used to live there"; that he had "brought some mail here for my wife"; and that he "saw the boyfriend's car in the driveway, it made him mad . . . [h]e lost his temper and entered the residence."

1. In his first enumeration of error, appellant contends that the trial court erred in denying his motion for directed verdict as to Count 1 of the indictment. Count 1 of the indictment in the case sub judice charged appellant with aggravated stalking for "contacting Tammy Carroll at her residence" for the purpose of harassing and intimidating her in violation of the TPO and the Judgment. Appellant's argument, as we are best able to decipher it, goes as follows: (1) only the terms of the TPO, *not* the Judgment, precluded appellant from contacting Tammy Carroll at her residence; (2) at the time of the incident, the TPO was "no longer in effect," having "expire[d] by operation of law thirty (30) days after its issuance" pursuant to the Civil Practice Act, and was superseded by the "Final" Judgment; and (3) since the TPO could not be violated because it was no longer in effect, and since contacting Tammy Carroll at her residence was not a violation of the terms of the Judgment, appellant was entitled to a directed verdict on Count 1 as alleged in the indictment. Appellant's argument fails for at least two reasons.

First, the TPO had not expired at the time of the incident. Contrary to appellant's assertions, a petition for relief filed under the Family Violence Act, OCGA § 19-13-1 et seq., and the orders resulting therefrom are not subject to the Civil Practice Act.[1] An ex parte order obtained pursuant to OCGA § 19-13-3 (b) is subject to the provisions of OCGA § 19-13-4, and under subsection (c) of that portion of the Code, any order obtained under the Family Violence Act, ex parte or otherwise, remains in effect for six months, unless specifically converted into a permanent order by the court. In fact, that provision of the Civil Practice Act upon which appellant relies for support of his contention that the TPO expired in 30 days as a matter of law, OCGA § 9-11-65, specifically provides that the Code section is "not applicable to actions for divorce, alimony, separate maintenance, or custody of children," which is the subject matter most closely aligned with the purposes for and contents of an order under the Family Violence Act. See OCGA §§ 9-11-65 (e); 19-13-4 (a) (1)–(11). Moreover, nothing in either the Family Violence Act or in the terms of the Judgment, itself, supports appellant's contention that the Judgment was a "Final" Judgment which "superseded" the TPO, thereby rendering the terms of the TPO null and void. In fact, both orders were valid for

---

[1] See 1995 Op. Atty. Gen. No. U95-7.

six months after their issuance. OCGA § 19-13-4 (c).

Secondly, even if the TPO had expired, contacting Tammy Carroll at her residence as alleged under Count 1 of the indictment *was* a violation of the Judgment. Under the Judgment, Ms. Carroll was given sole, exclusive use and possession of the mobile home. The Judgment evicted appellant from the property, ordered the county sheriffs to remove appellant from the property, and ordered appellant to provide 48 hours notice to Ms. Carroll before he even approached the property to obtain his child in the exercise of his visitation privileges. Appellant's pre-dawn break-in of Ms. Carroll's residence was a clear violation of the terms of the Judgment, and it strains credibility for appellant to argue that the Judgment of the court pursuant to the Family Violence Act did not protect Tammy Carroll from the type of "contact" at her residence that appellant employed in the case sub judice.

2. In his second enumeration of error, appellant contends that the trial court's failure to give his requested charge on circumstantial evidence pursuant to OCGA § 24-4-6 was reversible error.[2]

Trial courts are required to charge the principles of circumstantial evidence under OCGA § 24-4-6 in situations where the state's case includes both direct and circumstantial evidence, and the defendant has requested such a charge. *Stubbs v. State*, 265 Ga. 883 (463 SE2d 686) (1995); *Mims v. State*, 264 Ga. 271 (443 SE2d 845) (1994); *Grier v. State*, 217 Ga. App. 409, 410 (458 SE2d 139) (1995). Accordingly, in order to curtail the subsequent, inevitable analysis of the tendered evidence in a particular case as being direct or circumstantial or both, the safest course would be to just give the charge. See *Johnson v. State*, 210 Ga. App. 99 (435 SE2d 458) (1993). After all, "[i]t is a rare case that does not include direct and circumstantial evidence." *Yarn v. State*, 265 Ga. 787 (462 SE2d 359) (1995). However, the requested charge was not given in the instant case, and thus, once again, analyze the evidence we must. See, e.g., *Stubbs*, supra at 884-887. In so doing, this Court concludes that in the instant litigation lies the exception to the rule, i.e., the extremely rare case wherein the state relied not at all upon circumstantial evidence to prove the offenses against appellant, including the element of requisite intent.

"The distinction between direct and circumstantial evidence has best been explained this way: Direct evidence is that which is consis-

---

[2] We note that the state in the case sub judice argued to the trial court that appellant's request to charge pursuant to OCGA § 24-4-6 was, in essence, the "two theories" charge which has been disproved by the appellate courts. While the state was correct in its assessment of the standing of the "two theories" charge, the state incorrectly convinced the trial court that OCGA § 24-4-6 and the "two theories" charge are one and the same. They are not.

tent with *either* the proposed conclusion *or* its opposite; circumstantial evidence is that which is consistent with *both* the proposed conclusion *and* its opposite." *Stubbs*, supra at 885, citing 1A Wigmore, Evidence, pp. 948, 949, § 24 (Tillers rev. 1983). In other words, direct evidence demonstrates a defendant's guilt or his innocence, but cannot be consistent with both. In the case sub judice, the state's evidence consisted of direct testimony of both victims regarding appellant's conduct as alleged in the indictment. Pictures taken on the night of the incident were introduced which showed the bedroom window screen torn away, as well as the damage done to the trailer from the gunshot, the disheveled condition of the bedroom from the struggle, and Harvey's gun holster lying on the bed. Both 911 tapes were played at trial which permitted the jury to hear the appellant shouting in the background, and the voice of Tammy Carroll, clearly terrified, reporting appellant's actions as they occurred. When the police arrived, appellant was on the scene and stated to them that he had gotten angry and lost his temper when he saw Harvey's car in the driveway; that he had entered the residence.

Moreover and perhaps most importantly, appellant, in his own testimony, never denied any of the conduct alleged against him or that he intended to do the acts alleged against him. In fact, with the exception of his assertions regarding his dubious quest for stamps, appellant's testimony was remarkably consistent with that of the victims in this case, even as to the admission that he could have threatened to kill Daniel Harvey that night; being overcome with emotion, appellant simply did not remember. Instead, appellant offered a type of "moral justification" defense. Appellant's defense was that his actions were justified because his wife was having an affair with another man; appellant's defense was, in essence, "I acted like I think any man would have; on emotion." Appellant's case was an admission of guilt as to the acts alleged in the indictment, predicated upon the belief that the jury's sympathy and moral outrage at the victims' conduct would translate into a finding of not guilty on his part. The jury did not so find.

Thus, under the Wigmore direct evidence analysis as discussed above, the evidence was consistent only with appellant's guilt as to the acts alleged in the indictment and was "completely inconsistent with a reasonable hypothesis of innocence." *Johnson*, supra at 101. Accordingly, this Court finds that the failure to give appellant's requested circumstantial evidence charge pursuant to OCGA § 24-4-6 was not error.

3. In his last enumeration of error, appellant contends that the trial court erred by failing to charge the jury on the offense of "fighting words," OCGA § 16-11-39 (a) (3), as a lesser included offense of terroristic threats, OCGA § 16-11-37 (a). Appellant contends that

"fighting words" is a lesser included offense of terroristic threats because "both statutes include use of words toward another" with "the mental state attached to their utterance determining the distinction between the two." We agree that both offenses involve verbal communication; however, the similarity ends there. The type of words uttered, i.e., the prohibited conduct, and "the mental state attached" differ completely.

Under OCGA § 16-1-6, a crime is included in another as a matter of law when it differs from the crime charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpability suffices to establish its commission. OCGA § 16-1-6 (2); *Shuler v. State*, 195 Ga. App. 849 (395 SE2d 26) (1990).

A conviction for disorderly conduct, "fighting words," requires proof that, without provocation, a person used words toward another person which commonly create resentment sufficient to immediately incite a fight between speaker and listener. On the other hand, the law against terroristic threats prohibits a person from telling another person that he is going to commit a violent offense against him. One offense attempts to prevent unprovoked name calling in order to pick a fight and the subsequent anger caused thereby; the other offense attempts to prevent specific threats of physical violence toward another person in order to terrorize and the subsequent fear caused thereby. "The two offenses differ more than with respect to a less serious injury or risk of injury, or a lesser kind of culpability. OCGA § 16-1-6 (2). The crimes have different elements [and] prohibit generally different types of conduct." *Shuler*, supra at 850. OCGA § 16-11-39 (a) (3) is not included in OCGA § 16-11-37 (a) as a matter of law.

A crime is included in another as a matter of fact when it is established by proof of the same or less than all the facts or a less culpable mental state than is required to establish the commission of the crime *as alleged in the indictment*. OCGA § 16-1-6 (1). "We acknowledge that one crime may be changed into another by adding or subtracting elements which distinguish them. However, where the defendant is charged with a narrowly drawn [indictment] with a specific crime it is not within the power of the judge or the jury to interpret the facts as presented at trial to support an alternative, [unindicted,] separate offense. Criminal [indictments] are not deemed amendable to conform to the evidence." *State v. Tweedell*, 209 Ga. App. 13, 14 (432 SE2d 619) (1993); *Shuler*, supra at 850. In the case sub judice, appellant was indicted for threatening to murder Daniel Harvey with the purpose of terrorizing him. Under this narrowly drawn indictment, even if the facts had supported an *additional* offense of fighting words, which it did not, the trial court did

not have the power to interpret the evidence so as to support a jury charge on a separate, unindicted, alternative offense. "One can not be tried and convicted of an offense different from that for which he is prosecuted or called upon to answer." (Punctuation omitted.) *Tweedell*, supra at 14. There was no error in refusing to charge the jury on "fighting words."

*Judgment affirmed. Birdsong, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 10, 1997.

*Brenda J. Bernstein*, for appellant.

*Daniel J. Porter, District Attorney, George F. Hutchinson III, Assistant District Attorney*, for appellee.